Good morning to you all and welcome to the Inland Appellate Court. We have one case that's on the call for today. I'm going to ask the lawyers, when your case is called, all of you stand up and identify yourselves for the record. When you approach the bench to argue, I want you to identify yourself again so we know who's speaking so the record is very clear. You'll have ten minutes for your initial argument and five minutes in reply, counsel, if you wish to reply. If there are questions coming from Justice and I, we'll be happy to answer them. We might go longer, so we'll see how things go. Rest assured, Justice Hoffman, who is not here today, has read the briefs and will be listening carefully to the arguments that are offered today and will give the case careful consideration before he signs off on it. So with that, Madam Clerk, are we ready? 112586, People v. Aaron Diaz. All right, will the lawyers all identify themselves for the record, please? Your Honors, my name is Chris Gerke. I represent the appellant Eric Diaz. Good morning, Assistant State's Attorney Peter Maltese on behalf of the People, and I will be addressing issues 1, 2, 3, and 5. Thank you, counsel. Good morning, Your Honors. Assistant State's Attorney Joseph Alexander on behalf of the People of the State of Illinois. I will be addressing issue 4 if this Court chooses to hear on it. Thank you very much, gentlemen. All right, counsel, if you would proceed, please. Thank you, Your Honor. Your Honor, if it pleases the Court, I'd like to briefly address argument 1 regarding the Edwards violation, and then I'd like to move on to argument 4, the Miller v. Alabama issue. I'll rest my brief for the other issues, but obviously, I'd be happy to talk about them if this Court desires. Thank you, counsel. Your Honors, the United States has long held that once a suspect invokes his right to counsel, that all interrogation must cease, and that if it does not, a suspect's statement must be suppressed. Now, interrogation extends to any statement made by the police that's reasonably likely to elicit an incriminating response. Now, in Olivera, the Illinois Supreme Court made it clear that in deciding whether a statement is reasonably likely to elicit an incriminating response, the focus is primarily on the perception of the suspect and not upon the intent of the police. Now, in this case, after my client invoked his right to an attorney, he was told by police officers that he would be unable to leave the interrogation room until the State's Attorney determined what his charge was going to be. Let's get to the exact time frame. There were a number of different conversations between defendant and officer, so what conversation are you talking about now? I'm talking about, I believe this was about three hours before the ultimate confession he was told this, that initial statement. Was this the noontime discussion? I believe so, Your Honors, yes. I'd like to focus primarily on the final statement that was given to him, that being that the police would talk, he and the police would talk more in a little bit because they were not done yet and the State's Attorney is going to come out. Your Honors, as I just said, where a client invokes his right to an attorney, the police aren't allowed to further interrogate him. But what that statement, I think, clearly indicates to my client is that the State's Attorney and the police were going to continue to interrogate him, despite the fact that he's invoked his right to counsel. What do you mean they were going to continue to interrogate him? I don't understand that. Well, Your Honors, my client was told that they were going to talk more a little bit, that the police and State's Attorneys weren't done with him yet, and that specifically the State's Attorney is going to come out. I think that clearly indicated that the police and the State's Attorney were going to come speak to him, despite the fact that he's invoked his right to an attorney. I think that, because that's reasonably likely to elicit an incriminating response, that that statement, that therefore my client, therefore the police initiated the interrogation. Counsel, how do you pronounce your last name? Gerkey. Mr. Gerkey, I think that we can all assume that the police weren't done, that they were going to interrogate him more with a lawyer. I'm sure the State will say that if he invoked his right to counsel with a lawyer. So the fact that the police officer said they weren't finished, how is that suggestive of eliciting something that's prohibited or incriminating additional statements? I don't understand that. I understand, Your Honor. I think it's important to recognize that at that point, my client had been interrogated for 29 hours without having an attorney present. And so I don't think necessarily that when the State's, when the police and State's Attorney explain that, or I'm sorry, when the police officer explains that the police are going to continue to speak to him, that he will actually have an attorney present at that time. In addition, Your Honors, I'd like to point out that in Flores, the First District found that a statement that seems, in my opinion, is much less potentially coercive was reasonably likely to elicit an incriminating response. In that case, Your Honors. So just speaking hypothetically, when he asked that question, what's the correct response? So what would be an acceptable response from your point of view for the police officer to have made? I think an acceptable response from my point of view, Your Honors, would be to tell the suspect that you've invoked your right to an attorney, which means I can't speak to you. If you desire to speak to me, that means you have to waive your right to an attorney. Do you wish to waive your right to an attorney? Counsel, what if the defendant testified to a trial that would buttress your argument that he was somehow intimidated or confused by this statement? My client didn't say anything specific about whether he was intimidated or confused by the statement. So this is only your reasonable inference from the evidence, then? Right, Your Honors. When you're looking at this issue, Olivares says that you have to determine if the police statements to a defendant are reasonably likely to elicit an incriminating response, like they were in Flores, where the only thing the police officer said to the defendant as they were walking back from the bathroom was that the people outside the interrogation room were deciding who was going to be charged and what charges were going to be placed. Wasn't that different in this situation, factual distinction, because one defendant then was competing against the other then? That is not a distinction the Flores Court recognized were made in that case. Those facts didn't exist in that case, Your Honors, but in deciding whether that was reasonably likely to elicit an incriminating response, the Flores Court said absolutely nothing about that being a factor. I'm just saying the facts were different in Flores. Was there anything the police officer said in that conversation that would have any facts about the case or anybody else turning on him or anything else? In Flores? No, in our case. There was nothing about anybody. Well, he was told before he invoked his right to counsel that there was a video of the Martinez brothers inculpating him in the crime. But that wasn't during that conversation? Right, that's not. Let me ask you about the noon conversation, though. I believe that's a conversation where he asked if he would be able to talk to his lawyer today, and the officer said no, and then went on to make another statement about something else. That's one of the statements I believe I addressed. I agree that that statement, in addition to the other statements combined, but especially the final statement where he's told the police. The impression I'm trying to get across, the idea I'm trying to get across here, Your Honors, is that with multiple statements, in response to my client's questions of the police officers, which were not re-initiation of the interrogation, my client primarily asked, you know, when am I getting it out of here? Can I call my lawyer? In response to that, my client was told that he could not have a lawyer basically any time soon. He could not have a lawyer right now. He'd get one at some ambiguous time down the road. He asked specifically, can I call a lawyer, or can I make a phone call, and the police officer said no. He said you can make a call after you're sent to lockup. So I think that statement, in addition to the final thing that my client heard, was that the police and the state's attorney, I'm sorry, the police said we're going to talk more in a little bit. We're not done yet. The state's attorney is going to come out. From my client's perspective, which is the analysis in this case, it's not with the police in town, it's from the perspective of the suspect, that those statements were reasonably likely to elicit an incriminating response, such that it was the police that re-initiated the interrogation, which means that my client's statement should be suppressed. Didn't he re-initiate at 4 of 7? Wasn't he the one that re-initiated? The defendant? Your Honor, it's our position that because the police, when you make a, the Rhode Island V.N.S. and the United States Supreme Court, Peoples v. Oliveira indicate that when the police make statements that are reasonably likely to elicit an incriminating response, that that constitutes initiation. So it's finished, it's over once that statement was made by the police? That's our position, Your Honor. In short, Your Honor, because those statements were made, because the police re-initiated a discussion of the case, then Andre Edwards v. Arizona and Oliveira respectfully request that this court find that Eric Diaz, his subsequent statement should be suppressed. So could he have ever re-initiated at all, ever? I think, Your Honor, that at that point, once the police re-initiate, Edwards creates a bright-line rule that, it's called a bright-line prophylactic rule is how the Supreme Court describes it, that creates a presumption of involuntariness. Now I think that in this case where the police made statements that were reasonably likely to elicit an incriminating response, that my client's subsequent statement under Oregon v. Bradshaw say that it depends on who re-initiates, if the defendant re-initiates, then the question is whether it's a knowing and intelligent waiver. Your Honor, I think that once the state re-initiated, I'm sorry, not the state, once the police re-initiated, there's not another initiation after the re-initiation. So again, it's finished. It's finished, right. That's our position, Your Honor. Now if there are no further questions on this issue, Your Honor, I'd like to move on to the Miller v. Alabama argument. Before I begin this argument, Your Honors, I'd like to point out that similar issues as the one in this case are currently pending in the Illinois Supreme Court in three different cases. People v. Pacheco, People v. Terrell Jenkins, and People v. Patterson. Your Honors, with four cases in the last eight years, the United States Supreme Court has reiterated over and over again that children are fundamentally different than adults. Most recently in Miller v. Alabama, this Court's emphasized that there are important, I'm sorry, not this Court, the Supreme Court has emphasized that there are important but transient characteristics of youth that make minors categorically less culpable than adults for their actions and more likely to rehabilitate. Briefly, Your Honors, those three, the Miller Court focused on three main aspects of youth. That being, the lack of maturity and underdeveloped sense of responsibility. That they are more vulnerable to negative influences and outside pressures and are especially incapable of removing themselves from crime-producing environments. And finally, that they have an enhanced capacity for rehabilitation because their character is not well-formed, their traits are not fixed. Counsel, I don't disagree with that. I'm sorry, continue, Counsel. But let me ask you this. Don't we first have to decide if we're talking about the punishment aspect of this or the form of the adjudication? It is our position, Your Honors, that the form of adjudication is a punishment. By precluding 17, similar to the automatic transfer of 15 and 16-year-olds for murder, the preclusion of 17-year-olds from being treated as juveniles is a punishment. And it's our position that this Court should remand back for a first discretionary transfer hearing to determine whether or not the adult sentencing range is appropriate for my client. And if so, then to remand for a discretionary sentencing hearing where the Court would have discretion to give a sentence of something below 45 years. Do you argue that in your briefs to send it back? I absolutely do, Your Honors. Interesting. Thank you, Counsel. Continue. Your Honors, what Miller found was that children are, quote, constitutionally different than adults for the purposes of sentencing, which means that the imposition of a state's most severe penalties on juvenile offenders cannot proceed as though they were not children. Now, in Illinois law, the former exclusive jurisdiction statute, which required that all 17-year-olds be treated automatically as adults for every felony, the truth in sentencing statute and the 25-year fire item combine to require 17-year-olds to serve at least 45 years without any possibility of early release for the offense of first-degree murder. Now, put another way, Your Honors, 17-year-olds are required to be in prison until they're at least the age of 62 or until they've served 80 or 90 percent of an average expected lifespan before any consideration of the mitigating factors that Miller requires can be considered. Since mandatory natural life is no longer constitutional for juveniles, this is the single harshest mandatory penalty that can be imposed on juveniles in the state. Counsel, let's talk about people versus Harmon. Didn't they discuss Miller and Roper and Graham in all those cases? Are you referring to the United States Supreme Court case? The Illinois appellate court case. In Harmon? Harmon. I'm not familiar with that case, Your Honors, but I'd be happy to discuss it if you could give me some more information. Well, I mean, generally what the Illinois appellate courts have found is that the transfer of juveniles to adults doesn't constitute a punishment and that in these other orders that the Eighth Amendment isn't implicated. But we obviously disagree. We think that the transfer of a juvenile to adult court is absolutely a punishment because the only purpose of moving a juvenile and treating them as an adult is to increase their possible range of penalties. I'd like to point out that Illinois is in a minority of just 14 states that automatically treat minors as adults, which means that there's essentially a national consensus against the kind of statutory scheme that Illinois has. How old was he at the time of trial? At the time of trial, I think he was over the age of 18. But, Counsel, there's no distinction between the issue of a sentence of life without parole versus that juveniles can't get adult care. Strong sentence? There is a difference, Your Honors, but we think that the rationale in Miller that resulted in their decision applies equally here. In Miller, the court found that a mandatory natural life sentence was inappropriate or that it violated the Eighth Amendment because it didn't allow for any meaningful consideration of the characteristics of youth that I described before. Similarly, in this case, Your Honors, a mandatory sentence of life without parole until you live 80 or 90 percent of your life also gives no meaningful consideration to those same characteristics. It's our position, Your Honors, that if one is assuming that all 17-year-olds, regardless of their individualized circumstances that Miller requires, have to serve 80 to 90 percent of their lives until they're 62 in prison, that that doesn't allow any sort of, it can't give any effect to the Miller holding, Your Honors, if that's the case. I would also like to point out that the Iowa Supreme Court has followed similar reasoning and required remand for each jury sentencing in light of Miller for sentences below mandatory natural life. In particular, Your Honors, in the State v. Null, the court found that a 52-year aggregate sentence was sufficient to trigger Miller protections. Now, the court found that we do not regard a juvenile's potential future release in his or her 60s after a half century of incarceration sufficient to escape the community to obtain release based on demonstrated maturity and rehabilitation, which is exactly the same situation we have here, Your Honors. Counsel, let me ask you. I want to read you a little passage from Harmon and ask you to respond to it. Sure. People v. Harmon, this is the case that Justice Connors referred to a minute ago. And in that case, the court said, we follow Illinois precedent and reject defendant's argument that the exclusive jurisdiction statute violates his due process rights. Again, while the Illinois cases involve the automatic transfer provision, their reasoning applies equally here. Specifically, as those cases discuss, Roper and Graham address Eighth Amendment challenges, not alleged due process violations. Roper and Graham further involve sentencing statutes rather than forum statutes. So while defendant argues that the exclusive jurisdiction statute directly relates to sentencing, he cannot escape the fact that the statute itself does not impose any penalties. Can you respond to that? I'd be happy to, Your Honor. The answer to that question is that we are making an Eighth Amendment challenge. That was an entirely due process challenge. We make both. And what I'm discussing right now is an Eighth Amendment challenge. I'm not saying that the transfer, that the exclusion of 17-year-olds as juveniles isn't a punishment. I think it absolutely is. There are no procedural differences between adjudicating, well, there are some, but there are no meaningful procedural differences between adjudicating a crime as a juvenile between treating them as an adult. The primary difference is the dramatically enhanced sentencing range. A juvenile convicted of first-degree murder can only be incarcerated until they're 21. A juvenile convicted of a firearm, as in this case, faces a sentencing range of 45 years to life. Imposing even the possibility of that sentencing range is a significant punishment. And the transfer from juvenile to adult court has been found to be a punishment by other courts. For example, the Fourth Circuit found that in an ex post facto case, which is also an Eighth Amendment issue, a juvenile male found that the significance of the transfer is not that the transferred defendant must appear in a different court. The significance of the transfer is that the transferred defendant is subject to a much more severe punishment. And as I pointed out before, Your Honors, Illinois is in a minority of states that actually automatically treats juveniles as adults. Is there any reason to believe the trial judge, the sentencing judge in this case, did not consider the youth the defendant in sentencing? Well, Your Honors, I think it's clear to say that he may have considered the youth the defendant, but any of the middle or mitigating factors that he considered were considered as aggravation instead of mitigation. Miller doesn't just require that you consider these factors, it requires that you consider these factors as mitigating. Well, did the court actually say in sentence, I consider as aggravating the fact that he was 17 years old at the time? Well, he didn't say that specific sentence, Your Honor. I'm sorry, excuse me. She did not say that specific line, Your Honor. But what the judge actually did in this case also doesn't really pertain to whether the statute itself is constitutional. But the fact that she had discretion, again, as I pointed out, the judge only had discretion to impose something higher than 45 years. She exercised her discretion. Didn't she reconsider and take five years off the sentence? She did, Your Honor, but we're raising a constitutional challenge to this issue, saying that where you're starting at 45 years, that is just too much, and it's too much like giving a life sentence to a juvenile, that the same considerations apply. The U.S. Supreme Court found that mandatory life without parole doesn't give a meaningful consideration to the Miller factors. And similarly, mandatory life without parole until you're 62 also doesn't give any meaningful consideration to the same Miller factors. Many children could potentially be rehabilitated or have substantially diminished culpability. It's a clever argument, but I don't know whether I agree with it or not. What's the basis of the fact that it's a life sentence? I agree it's a long sentence, but he also killed somebody. Let's not let that get lost in what we're discussing here, either. So what's the, you say it's a life sentence. I agree it's a long sentence, but why do you say it's a life sentence? I'm sorry if I misspoke, Your Honor. I'm not saying this is a life sentence. I'm not saying it's a de facto life sentence. I'm sorry if I misspoke, if that's what I said. What we are saying, Your Honors, is, and I'd like to focus, we're not taking a lot of the fact that somebody might have been killed here. And indeed, that's a factor that courts should be able to consider. The only thing we're asking for is that courts have discretion after Miller to consider whether juveniles should first be subject to an adult sentencing range, and then what that sentencing range, and then what that sentence should be. Here, courts don't have any discretion at all to consider the mitigating factors of youth or the culpability. My client may very well deserve and get a sentence of 45 years or a sentence of 60 years. The only thing we're asking for is that trial courts have discretion, as Miller says, to consider the mitigating factors of youth. I don't understand why you're arguing that, I don't see anything in the record to suggest that this trial judge did not consider the mitigating factors. Tell me why you've concluded that. Your Honors, first of all, I'd like to point out that, again, we're making a constitutional challenge. So what we're saying is that my client and other 17-year-olds who are subject to a minimum sentence of 45 years automatically with no consideration of their youth is unconstitutional. So the issue isn't whether you can give some kind of, from our position, it's not whether you can give some kind of discretionary sentence after 45 years. We're saying that any kind of discretionary sentence you can give after 45 years for a 17-year-old doesn't afford any consideration of the Miller factors. What we're concerned with is the mandatory minimum of 45 years. In this case, Your Honor, I would like to point out that during the sentencing hearing, my client did testify that he grew up in a gang and drug-infested area, he had suffered from anorexia and depression when he was 13. The court found specifically that he was clearly trying to impress older gang members and that this act was senseless. All those things are actually mitigating factors in a Miller analysis, yet my client got a sentence of what is a de facto life sentence of 60 years. But again, what we're focusing on is whether, after Miller, a mandatory sentencing scheme where children who must serve 45 years without any possibility of early release is considered unconstitutional. It's our position that it's not. Counsel, can we get out of Eighth Amendment land for a minute, please, and get back to the trial? Your defense of trial was unreasonably that it was necessary for him to take this action. That was my client's defense. So using the fact that that defense was used at trial, he admitted that he was the shooter, correct? That's correct. So this whole issue of the statements made to the police officer whether or not they were appropriately, again, it's constitutional rights to an attorney.  So he had a real issue whether his defense worked at trial or not? He admitted he was the shooter at trial because he knew that that statement was, I mean, I'm assuming that was a defense he decided to put in after that. He knew that his confession would be introduced against him. Well, there were other witnesses, though, that would say that he was the man in the car and got out and they heard shots. Your Honor, what the other witnesses said is hardly overwhelming evidence if you're taking away the confession. But all the state has is basically a testimony of one witness, Jessica Gwin, who testified that my client went to a person named J.D. to pick up a gun, said, let's go kill some Milwaukee kings, and asked them to drive back to the scene, presumably so he could do that. However, every single one of those statements is directly contradicted by other people in the car or not corroborated by them. Well, the things around it, like when he got the gun, where they went. But as far as him stopping at that location, getting out of the vehicle, they heard shots, he got back in, that testimony was all the same. That testimony was the same, Your Honor, but every single witness, none of the state's witnesses saw what happened in the moments immediately before the shooting. I understand that, but there was another witness that was outside of the people in the car, correct? Right, that was the defense witness who said she did see Nico Desort reaching for his waist. But she did see a man with braids get out of the car with a gun. Right, and there's no disputing that my client shot the victim, Your Honor. Right, right. The only issue is whether my client shot the victim because he unreasonably believed that his life was in danger when someone reached for the waist. And where the state's witnesses all admitted that none of them saw what happened in the moments before the shooting. The only testimony of what happened in the moments before the shooting is testimony of my client and testimony of the defense witness. And I don't think that's overwhelming evidence against my client, Your Honor. But it's a credibility question. I mean, the jury got to hear all of that, the fact that he went to the location, got out of the car. I mean, your client kind of instigated a lot of that. So the jury got to decide whether they were going to believe this self-defense theory or not. I mean, what do we do with that? We weren't there. We didn't hear it. We didn't get a chance to see the witnesses. We didn't hear the testimony. We just weren't looking at the record. And the jury obviously found his version of events incredible. So what do we do with that? Well, that's true, Your Honor, but we're not making a sufficiency argument asking you to overturn the jury's decision. The only way the facts matter here is if the court finds that there is an admissible evidence that was introduced. So if this court finds that his confession should be suppressed, then this court does then engage in a factual analysis. But I'd like to point out that the Illinois Supreme Court has repeatedly stated that confessions are so extremely probative that it's a rare case where the suppression of a confession wouldn't have impacted the result of the case. And so it's also the state's burden to prove beyond a reasonable doubt that the error didn't affect the outcome of the case. Counsel, thank you. Thank you very much. Mr. Maltese. Again, your name, sir. Once again, Assistant State's Attorney Peter Maltese on behalf of the people. And I will be addressing a response to Defendant's Argument 1. The trial court correctly denied Defendant's motion to suppress his confession. The detective's conducts throughout the interrogations were correct. And at the onset, I could correct one thing that Counsel said when he said that Defendant was interrogated for 30 hours. He, in fact, was not interrogated for 30 hours, although in custody for 30 hours, each and every time he asserted his Miranda rights, questioning stopped. And questioning did not begin again until Defendant himself reinitiated. Defendant brings to the court's attention specifically clip number 7. At the suppression hearing, the party stipulated to which clips the court would consider. There were nine clips. The clip that Counsel focuses argument on was on clip number 7. And that began at 1.48 on the second day of questioning. And that clip was specifically after Defendant was brought food. And it's a very short clip. If I could briefly read through it. Defendant, thanks a lot, man. Like I said, so I'm going to be out of here like 11 tomorrow. Detective Adams answered, tomorrow sometime. Tomorrow like around 11 o'clock. One way or another we'll make a decision. Defendant asked, I can't make a phone call. The detective answered, you'll be able to do it when you hit lockup today. When you hit lockup, okay. Answer, what? When you hit lockup, the detective repeated. Defendant asked, what's that? Because they're going to fingerprint you. They're going to fingerprint, photograph you again, all that stuff, okay. Defendant, so I'm going to be sent to Division 1. Defendant was in Cook County and he was brought to the police station on this case. And I believe he was asking whether or not he was going to be brought back to Cook County. Answer, well I don't know where you're going to be. That's right there. What's that right there? Defendant, that's a wet towel, a wet paper towel. Detective answered, a wet towel. We'll talk more in a little bit. We're not done yet. The state's attorney is going to come out anyways again. The context of the statement, we'll talk again, is in context of these questions the defendant is asking about what's specifically going to happen to him that day. When's he going to make a phone call? When's the decision going to be made? There's nothing to suggest that the police or the state's attorney were going to ignore his Miranda rights and question him again. And in fact, they never in fact did so. The context makes clear that we're going to be talking about procedural issues. Counsel, same question I ask opposing counsel. What did the defendant say at trial was his impression of that? Did he testify to that at trial? Well, he was asked why he confessed. And he stated he confessed because he heard the Martinez brothers, their statements, and he realized that his denials were no longer working. He mentioned nothing about the fact that I confessed because I felt like I was going to be questioned again. And it simply wouldn't make sense if he believed that the interrogation was going to continue despite his evocation of his right to counsel that he would three hours later knock on the door and say I'm ready to cooperate. He in fact would have waited for the interrogation to continue. You're opposing counsel's right to focus on the suspect at this point in time under the N-words analysis, correct? So focusing on the suspect only, what is there in the record? Well, as I mentioned, there's the context of where the statement was made. The statement was made in the conversation about prison procedure. The United States Supreme Court in Ogden v. Branshaw mentioned the fact that discussion about that's incident to the custodial relationship is not a re-initiation by the police. And in fact, this court recently decided, people v. Cronenberg, which facts are very similar. In that case, the defendant was arrested shortly after midnight and although one of the issues was whether or not he invoked his right to remain silent, this court found he didn't evoke Miranda until he asked for an attorney at approximately 253. And like in this case, the defendant asked questions about processing. He was being brought to processing and he asked what's going on. And in response, the officer said, you're being processed for his arrest. And then defendant stated he didn't want to go down for murder. Thus, in that case, this court found it was defendant who re-initiated. Much like in the current case where the officer was explaining processes. But what about what your opponent said? And this is pretty clear cut. If the police officer had said, you know, you asked for a lawyer, I really can't talk to you anymore. How about if he had just said that? We wouldn't be here talking about this issue. What we might be talking about is whether or not that was corrosive. Because in fact, when am I going to get out? The detective's answer is, I can't tell you. I could be Miranda to you. Oh, you're under Miranda warnings. I don't think that's what he said. He said, I cannot talk to you any longer once you've asked for a lawyer. I mean, what if he said that? As opposed to answering questions, when can I make a phone call? Again, I believe that would have made it even more corrosive atmosphere. Because defendant would have no idea when he's going to get out, no idea when he's going to make a phone call. And his will, in fact, may have been overcome by that fact, uncertainty. In this case, Detective Adams correctly answered the questions and gave defendant the perimeter of how long he needs to remain silent, should that be his decision. It was a correct action on this part and gave defendant the tools in order to exercise his Miranda rights or waive the Miranda rights, which is exactly what he decided to do with full knowledge of the process. The appellant seems to state that once that occurred, everything should have stopped. And there was no ability for the defendant to reinitiate. Do you agree with that? Oh, no, not at all. The defendant could always reinitiate. I'm not sure if I understand the question. Well, when I asked counsel, I said, at that time, at the 148, when they talked about, he said, can I use the phone or whatever, and they said, you can use the phone when you get to law. He claims that that was a request for counsel, I believe, and all conversation should have stopped. Do you agree with that analysis? And there's no way he could have reinitiated? No, I don't agree with that, because at this point in time, he's already under his Miranda rights, under his evocation of his right to counsel. And once the cases are very clear, the defendant can evoke his Miranda rights, and then he can reinitiate. And virtually every case cited in both of our briefs recognized that fact. Briefly, I want to distinguish Olivares and Flores, the two cases for which he rests upon. And in those two cases, Flores mentioned, in both those cases, the reinitiation was by the police, because the police had given the defendant information regarding the investigation. He's been identified in a lineup, the state attorney is here and is going to decide who is actually going to be charged in this case. In this case, nothing the detective gave the defendant involved any suggestion of what the investigations are occurring. Defendant knew that co-defendant's statements were made to him, because he was aware of that point when he was charged. He was, in fact, had him waived his Miranda. In conclusion, the detective's actions were wholly proper here. Each and every time, defendant evoked Miranda, questioning stopped, and questioning did not continue until defendant actually knocked on the door and said, I'm ready to cooperate. Three hours after the last interaction, and subsequently he was re-Mirandized and he gave his confession. For the reasons stated and the reasons my colleague... I want to ask you a question about issue two. Your opponent didn't raise it, but I'm curious about this. What was the need for introducing the gang graffiti? Why did you need to do that at trial? The issue in this case, as my opponent points out, was really defendant's mental state when he shot his victim. But he admitted that he shot him and he admitted that he thought that the victim was reaching for something. How was the gang graffiti probative of that issue? It sounds like a kitchen sink kind of thing to me, where we were throwing in everything but the kitchen sink. Why was the gang graffiti necessary to be introduced? It went to his motive. The people's theory was that defendant shot his victim because he felt insulted over the gang tagging. How does showing the jury that he was doodling with gang graffiti in the interrogation room prove that issue? It shows that tagging is so important to this defendant that he's willing to kill. That gang tagging, gang signing, the extent of his insults from being signed by a rival gang, was enough to make this defendant want to kill that person. What issue is this probative of? It's probative of his mental state. Although he admitted killing the victim, he stated it was due to his belief in the need to use self-defense. This is probative that defendant did not shoot because of self-defense. Defendant planned to shoot his victim because he was insulted for the gang signing. Were there limiting instructions given to the jury about this? No, there were no limiting instructions given and no limiting instruction was requested. The jury was instructed that any convictions, and I realize this wasn't a conviction, but it is... I don't want to hear about jury instructions in general. Just with respect to this, were there any limiting instructions given to the jury? No, there wasn't any limiting instructions. And it's your position that it was necessary to admit the gang graffiti that he scrawled on the wall in the interview room to show his state of mind when he killed the person, whenever it was, a year before, whenever it was, it was sometime before. And that's your position, right? That and additionally it shows his mental state when he gave his confession. He had testified that he gave, when cross-examined, his confession did not include any suggestion that he shot based on self-defense. And during his cross-examination when he's asked why didn't you mention that and why didn't you mention other facts such as that his rival gang had used a sort of a shooting gesture while he left those facts out and he mentioned the fact that he was scared. And that evidence also went to show that he really was quite relaxed and that he felt comfortable enough to put graffiti over the walls. Telling us the fact that he drew a picture of Reece Park, which he admitted was the Milwaukee King, his rival's territory, and put his gang insignia over that. Oh, I read what he did. My question was much more narrow. What was that probative of and why was it necessary to send that to the jury? And I heard your answer. I don't know that I agree with it, but I heard it. Counsel, let me ask you this. I believe in one of your briefs you state that it was relevant to show that, contradict his statement that he was in fear of the police during the time that he was being interrogated. Is that your argument? My argument is two points. It goes towards his mental state while he was committing the crime. He was in fact establishing his territory during the crime. Again, did he testify at any time during the trial that he was in fear of the police during the time that he was in custody? Yes. Well, he testified that the reason why he didn't give complete information was because he was scared. Now, he didn't say specifically scared of the police, but he did say that he was in fear of the police. He did state that he was frightened. And also that they didn't ask these specific questions, too. Okay. All right. Thank you. Okay. Thank you. Mr. Alexander? Thank you, Your Honor. May it please the Court. Assistant State's Attorney Joseph Alexander on behalf of the people of the State of Illinois. I will be addressing defendant's constitutional challenge to the exclusive jurisdiction statute. I'll do that as briefly as possible, as briefly as can be done with an Eighth Amendment issue. Do you know about People v. Harmon? Your Honor, I have read People v. Harmon, and I will admit that I am not 100 percent. What's the word I'm looking for? I'm not well versed in it. I know the general holding, but I'm not 100 percent. I am familiar with People v. Harmon in the extent that it analogizes the exclusive jurisdiction statute with the automatic transfer statute. And the automatic transfer statute has been upheld as constitutional for the simple reason that the Eighth Amendment is not implicated with the automatic transfer statute. The same reason it applies to the exclusive jurisdiction statute. The statute is a statute dealing with venue and not a statute dealing with purpose. Under none of the Eighth Amendment precedent can a statute establishing venue be considered punishment. When we look at the history of the Eighth Amendment, it has always dealt with some type of physical torture or some type of confinement or condition of confinement. The exclusive jurisdiction statute is neither one of those. It merely establishes venue in the form where guilt or innocence can be determined. So the defendant's constitutional challenge fails under that reasoning. It also fails because Graham and Miller really don't apply to this case. Now the general proposition that juveniles are different for the purposes of sentencing applies. Graham and Miller said it applies no matter what the crime. But if we look at Miller and Graham, those decisions were very narrowly tailored to address two issues. Whether a juvenile could be sentenced to life in prison without parole for a non-homicide crime and whether a juvenile could be sentenced to life in prison without parole for homicide. With Miller, there was an additional factor of it being a mandatory sentence. That is not present in the Eighth Amendment. There was not a mandatory life in prison without parole sentence that was imposed on this defendant. Furthermore, if we look at the sentencing hearing, everything that Miller requires was done here. The trial court considered factors in aggravation and mitigation, specifically mitigation, which is statutorily required. So the holding of Miller was complied here as far as individualized sentencing hearing. The fact that there was a mandatory minimum doesn't negate that fact. Miller does not hold that juveniles cannot be sentenced to mandatory minimums. In fact, if we look at Miller in their discussion of the actual Miller case, because there were two cases involving Miller, Jackson and Miller, they looked at the Miller case and said, we shouldn't sentence this juvenile to mandatory life in prison. We shouldn't sentence this juvenile to mandatory life without an individualized sentencing hearing, but there is no doubt that a severe punish is necessary for what he did. And that supports our position that Miller does not apply to mandatory minimum sentences. It does not say juveniles cannot be sentenced in adult court. It simply says that if you were going to sentence a juvenile in an adult court, you have to consider the youthfulness and everything that it encompassed that was done here in this case. So for those reasons, we ask that you reject the constitutional challenge to the Eighth Amendment and affirm the defendant's conviction and sentence based on the other reasons stated here and in our briefs. Thank you. I'll just focus just on that last argument, Your Honor. The idea that it's a venue change and not a punishment change, I think, is clearly incorrect, Your Honor. As I said before, a minor who is convicted of first-degree murder will conserve a maximum of five years in juvenile prison, whereas if he is just charged as an adult, then he is facing a mandatory minimum sentence of 45 years to life. The idea that a mandatory minimum sentence isn't implicated by Miller, I think, is also wrong. The reasoning in Miller was that our children are fundamentally different and that a mandatory life sentence doesn't allow meaningful consideration of those differences. Isn't the reasoning different than the holding in Miller? You're absolutely right. Miller only addressed the issue of mandatory natural life. However, Your Honor, we think that the reasoning of Miller extends to this case because there is no meaningful consideration of the Miller factors when a 17-year-old is forced to live 80 to 90 percent of their expected life. Thank you, Your Honor.